UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

DIANE CARLSON,

    Plaintiff,

v.

NANCY A. BERRYHILL,

    Defendant.

Case No. 18-cv-03107-LB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REMANDING CASE**

Re: ECF Nos. 17 & 18

## INTRODUCTION

Plaintiff Diane Carlson seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying her claim for disability benefits under Title II and Title XVI of the Social Security Act.[1] She moved for summary judgment.[2] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[3] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. All parties consented to

---

[1] Compl. – ECF No. 1; Motion for Summary Judgment – ECF No. 17 at 1–2. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Motion for Summary Judgment – ECF No. 17.

[3] Cross-Motion – ECF No. 18.

magistrate-judge jurisdiction.[4] The court grants the plaintiff's motion, denies the Commissioner's

cross-motion, and remands for further proceedings.

## STATEMENT

### 1. Procedural History

On August 22, 2012, the plaintiff, born on February 27, 1963, and then age 49, filed claims for

social-security disability insurance ("SSDI") benefits under Title II of the Social Security Act and

supplemental security income ("SSI") under Title XVI.[5] She alleged neck pain, shoulder pain,

pain, numbness, and tingling in the left hand, shooting pain in the left leg, carpal tunnel in both

hands, diabetes, depression, blurry eye sight, and pain in the side of her shoulder.[6] She alleged an

onset date of May 31, 2012.[7] She subsequently filed claims for SSDI benefits and SSI on October

15, 2015, alleging an onset date of December 17, 2014.[8] The Commissioner denied her claims

initially and on reconsideration.[9] The plaintiff requested a hearing.[10]

On September 3, 2014, Administrative Law Judge Richard P. Laverdure (the "ALJ") held a

hearing in Oakland, California.[11] Attorney Raymond Ugarte represented the plaintiff.[12] The ALJ

heard testimony from the plaintiff, vocational expert ("VE") Malcolm Brodzinsky, and medical

expert ("ME") Anthony Francis.[13] On December 17, 2014, the ALJ issued an unfavorable

---

[4] Consent Forms – ECF Nos. 12 and 13.

[5] AR 101, 115, 205–06.

[6] AR 101.

[7] AR 115, 205–06.

[8] AR 1045–54, 1055–56. The plaintiff filed her subsequent applications while her original application was pending appeal at the United States District Court level. *See* Remand Order, 3:15-cv-03922-EDL – AR 923–26. That case was remanded and the subsequent claims were consolidated pursuant to the Appeal Council's remand order. *See* AR 930.

[9] AR 132–36 (initial); AR 139–44 (reconsideration).

[10] AR 146–47.

[11] AR 38–100.

[12] AR 38.

[13] *Id.*

decision.[14] The plaintiff appealed the decision to the Appeals Council on January 12, 2015.[15] The Appeals Council denied her request for review on June 30, 2015.[16]

The plaintiff filed an action with the court, which remanded the matter pursuant to the parties' stipulation.[17] The Appeals Council consequently vacated the ALJ's prior decision, finding that the ALJ did not "inquire or discuss occasional overhead reaching with the claimant's right arm" during the September 2014 hearing.[18] The Appeals Council thus instructed the ALJ to (1) give further consideration of the plaintiff's maximum residual functional capacity ("RFC") and provide sufficient evidentiary support for the same, and (2) obtain supplemental VE testimony regarding the effect of the assessed limitations on the plaintiff's occupational base.[19]

The ALJ conducted the remand hearings on October 26, 2017 and February 13, 2018.[20] Attorney Cyrus Saffa represented the plaintiff at both hearings.[21] The ALJ heard testimony from the plaintiff, VE Susan Creighton Clevelle, VE Lawrence Hughes, and ME Ronald Kendrick.[22] The ALJ published an unfavorable decision on March 1, 2018.[23] The plaintiff filed this action for judicial review and subsequently moved for summary judgment on October 25, 2018.[24] The Commissioner opposed the motion and filed a cross-motion for summary judgment on November 21, 2018.[25]

---

[14] AR 20–36.

[15] AR 18–19.

[16] AR 1–6.

[17] AR 923–26.

[18] AR 929–30.

[19] AR 930.

[20] AR 901–22 (October 2017 hearing transcript); AR 861–900 (February 2018 hearing transcript).

[21] AR 861, 901.

[22] AR 861, 901.

[23] AR 846–60.

[24] Motion for Summary Judgment – ECF No. 17.

[25] Cross-Motion – ECF No. 18.

### 2. Summary of Record and Administrative Findings

#### 2.1 Medical Records

##### 2.1.1 Alameda County Medical Center — Treating

The plaintiff visited Alameda County Medical Center on various occasions between August 2012 and January 2013.[26] The records indicated that she had chronic neck and shoulder pain and degenerative-joint disease.[27] She could not raise her left arm overhead due to shoulder pain and stiffness.[28] She often described her pain as between 8/10 and 10/10.[29]

On December 5, 2012, Yasmeen Haq, M.D., an internist, wrote a doctor's note stating that the plaintiff could not return to work until June 3, 2013.[30] Dr. Haq saw the plaintiff on December 26, 2012 for shoulder pain.[31] The plaintiff described her pain as 9/10.[32] Dr. Haq prescribed 500 mg of hydrocodone-acetaminophen and 600 mg of ibuprofen to be taken as needed.[33] She referred the plaintiff to neurosurgery and physical therapy.[34]

On January 19, 2013, Jackie Bolds, M.D., an internist, saw the plaintiff regarding lab results, shoulder pain, and insomnia.[35] Dr. Bolds referred the plaintiff to orthopedics for a steroid shot and recommended heat therapy, local anesthetic cream, acupuncture, and ibuprofen.[36] She prescribed Ambien for the plaintiff's insomnia.[37]

---

[26] AR 476–546.

[27] *See, e.g.*, AR 506, 518.

[28] AR 518.

[29] *See, e.g.*, AR 484, 494, 520.

[30] AR 511.

[31] AR 492–95.

[32] AR 494.

[33] AR 495.

[34] *Id.*

[35] AR 476–77.

[36] AR 476.

[37] *Id.*

### 2.1.2 Kaiser Permanente Medical Group — Treating

The plaintiff was treated at Kaiser Permanente Medical Group various times between February 2, 2013 and January 2, 2018.[38]

On February 4, 2013, Carmina Isabel Ramos Dizon, M.D., a family-medicine specialist, saw the plaintiff for an annual checkup.[39] Dr. Dizon diagnosed her with neck pain, prediabetes, atopic dermatitis, and shoulder-joint pain.[40] Dr. Dizon noted that the plaintiff had been diagnosed with degenerative-joint disease and herniated cervical discs.[41] The plaintiff had not tried physical therapy.[42] Her pain had been occurring for three years.[43] There was "no identifiable cause and it happened gradually."[44] The plaintiff had been told previously that she had a "frozen shoulder" and needed neck surgery.[45] Her pain was trigged by movement.[46] Dr. Dizon referred the plaintiff to rehabilitation and an MRI for her neck pain and referred her to physical therapy for both her neck and shoulder-joint pain.[47] Dr. Dizon suggested lifestyle changes, such as diet and exercise, for the plaintiff's prediabetes.[48]

On February 8, 2013, physician assistant ("PA") Justin Erich Brillo saw the plaintiff for left shoulder pain.[49] She reported that her pain worsened with overhead motion.[50] She had not attempted physical therapy.[51] Padmaja Sista, P.T., a physical therapist, saw the plaintiff for a

---

[38] *See* AR 570–649, 655–73, 695–756, 776–834, 1169–1201, 1296–1851, 1853–2887.
[39] AR 577–78.
[40] AR 577.
[41] AR 578.
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] AR 579.
[48] *Id.*
[49] AR 600.
[50] *Id.*
[51] *Id.*

cervical-spine evaluation on February 11, 2013.[52] She noted that the plaintiff had "good" rehabilitation potential for her shoulder and neck pain.[53] P.T. Sista recommended therapeutic exercise, functional-activity training, and group exercise.[54] The plaintiff indicated that she did not want to proceed with physical therapy on a weekly basis due to a high co-pay.[55]

Dr. Dizon saw the plaintiff for a follow-up appointment on March 5, 2013. Dr. Dizon noted that the plaintiff's insurance did not cover physical therapy.[56] The plaintiff refused physical therapy for her chronic neck pain.[57] Dr. Dizon further noted that the plaintiff had no numbness, tingling, or weakness in her extremities.[58] The plaintiff also had no joint tenderness, deformity, or swelling.[59] Moreover, the plaintiff's shoulder-injection relief lasted for only one day.[60] Dr. Dizon reported that the plaintiff appeared "alert, well appearing, and in no distress."[61]

On April 1, 2013, Dr. Dizon saw the plaintiff for neck pain and carpal-tunnel syndrome.[62] The plaintiff was advised to get neck surgery, but she refused.[63] A spine-clinic doctor suggested that the plaintiff take pain medication and undergo acupuncture.[64] Dr. Dizon recommended that the plaintiff follow up with the spine clinic for a second opinion about her neck pain.[65] Dr. Dizon

---

[52] AR 602–05.

[53] AR 603.

[54] Id.

[55] AR 603, 605.

[56] AR 621.

[57] Id.

[58] Id.

[59] Id.

[60] Id.

[61] Id.

[62] AR 643–45.

[63] See AR 643, 731, 792, 1311, 1489.

[64] AR 643–44.

[65] AR 644.

referred the plaintiff to a neurology lab for electromyography testing for her carpal-tunnel syndrome.[66]

On April 8, 2013, PA Brillo saw the plaintiff for left-shoulder pain.[67] The plaintiff reported that her pain was worse with "overhead motion" and "carrying weight."[68] A joint injection provided "little relief."[69] PA Brillo noted that the plaintiff had "tenderness to palpation over ac joint" in her left shoulder.[70]

On May 29, 2013, Francis Alarico, P.T., a physical therapist, called the plaintiff to advise her regarding the chronic-pain program.[71] The plaintiff did not answer.[72]

In April 2014, Dr. Dizon advised the plaintiff regarding her prescription-medication use and informed her that she would need to take a urine test for continued use.[73] The plaintiff responded, "why do [I] have to get tested. I refuse to do that. im usally [sic] in pain so i do need my medicine since therapy doesn't work nor I want surge[r]y."[74]

On May 8, 2014, Dewate Sumetanon, M.D., a physical medicine and rehabilitation specialist, summarized the plaintiff's neck- and shoulder-pain treatment history as follows: "Cerv[ical] surgery recommended, however pt never wants surgery for this. I recommended acupuncture, she went once and never returned. Referred to Chronic Pain Program last year, never showed up. Doesn't do PT. Says she does nothing at home."[75] Dr. Sumetanon referred the plaintiff to acupuncture, as she indicated she was willing to try it again.[76] He also referred her to a stress-

---

[66] AR 645.
[67] AR 647.
[68] Id.
[69] Id.
[70] AR 648.
[71] AR 723.
[72] Id.
[73] AR 1501.
[74] AR 1501–02.
[75] AR 818–19.
[76] AR 820.

reduction program.[77] He encouraged home exercise and using heat and ice before and after exercise, respectively.[78] The plaintiff declined physical therapy.[79]

In October 2014, PA Brillo saw the plaintiff for left-shoulder pain.[80] The plaintiff reported that her pain worsened with overhead motion.[81] She declined a cortisone injection and requested a surgery consultation to discuss further treatment options.[82]

Jun Matsui, M.D., an orthopedic surgery, consulted the plaintiff in February 2015 in preparation for her carpal-tunnel release.[83] Dr. Matsui also noted that the plaintiff was at a "higher than usual" risk for persistent numbness due to her neck conditions.[84]

As of November 17, 2016, the plaintiff was still pre-diabetic.[85] She again was recommended to exercise regularly, lose weight, and eat a proper diet to prevent the development of diabetes.[86]

On July 30, 2017, the plaintiff was treated for an ankle sprain.[87] She received an x-ray of her ankle, was placed with a splint, and given crutches.[88] She did not show up for a follow-up visit, which was scheduled for August 9, 2017.[89]

In August 2017, the plaintiff attempted to fill her opioid medication early with Kevin Gerard, Hart, M.D., her primary-care physician.[90] On September 25, 2017, the plaintiff received chronic-

---

[77] Id.

[78] Id.

[79] Id.

[80] AR 1862.

[81] Id.

[82] AR 1862–63.

[83] AR 843–45, 1218–21.

[84] AR 1221.

[85] AR 2126, 2129–30.

[86] AR 2129–30.

[87] AR 2452–57.

[88] AR 2455.

[89] AR 2493.

[90] AR 2503.

opioid treatment for her neck pain.[91] She reported that her "depression symptoms [were] better" but complained of "drowsiness" from Celexa.[92] The plaintiff stopped taking Norco when she was denied a refill.[93] She reported Norco helped with her pain and helped her "function better."[94] She did not believe that stopping Norco caused her depression.[95] Dr. Hart prescribed Hydrocodone-Acetaminophen for her pain.[96] On November 17, 2017, Dr. Hart noted that the plaintiff attempted to refill her opioid medication five days early.[97]

On November 17, 2017, Jennifer Anne Johnson, M.D., a rheumatologist, saw the plaintiff for chronic-pain disorder.[98] The plaintiff reported "all-over body pain" and that she was not sleeping well due to pain.[99] She received a cortisone injection for her left-trigger finger and was referred to a chronic-pain class.[100] As of December 5, 2017, the chronic-pain-management clinic had attempted to contact the plaintiff four times regarding her referral.[101] The plaintiff did not respond.[102] Ultimately, the clinic closed her referral because she was contacted "multiple times by phone and secure MSG," but the plaintiff did not return the calls.[103]

On November 27, 2017, Dr. Hart noted again that the plaintiff sought early refills of Norco and Ambien.[104]

---

[91] AR 2541–44.

[92] AR 2541.

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] AR 2542.

[97] AR 2564.

[98] AR 2590–2600.

[99] AR 2590.

[100] AR 2593.

[101] AR 2646; *see also* AR 2638.

[102] AR 2638, 2646.

[103] AR 2651.

[104] AR 2605.

### 2.1.3 Omar C. Bayne, M.D. — Examining

On February 22, 2013, Omar C. Bayne, M.D., an orthopedic surgeon, saw the plaintiff regarding her neck and left-shoulder pain.[105] Dr. Bayne noted that the plaintiff had been diagnosed with cervical degenerative-disc disease and had been treated conservatively with pain medication, anti-inflammatory medications, and physical therapy.[106] She had also been diagnosed with left-rotator-cuff calcific tendonitis and was given conservative treatment.[107] Her neck pain was aggravated with "repetitive flexion, extension, rotation of her neck."[108] Her pain woke her up at night and "bother[ed]" her when she attempted to work with her left hand above shoulder level.[109]

Dr. Bayne noted that the plaintiff was in no acute distress, oriented to time, place, and person, and well-groomed.[110] She could squat, sit, and get up from a sitting to standing position without difficulty.[111] He found that the plaintiff had "significant paracervical muscle spasms to palpation" and "tenderness to palpation over both trapezius muscles" with respect to her cervical spine.[112] She had a full range of movement in the right shoulder.[113] Her left shoulder was "tender to palpation over the lateral acromion and left shoulder girdle muscles."[114] Her manual motor-strength testing was "5/5 in all muscle groups" in her upper extremities, except the "right shoulder girdle muscles were 4/5."[115] She had a "normal lordotic curve of her lumbar spine" and full range of movement in her hip, knees, and ankles.[116]

---

[105] AR 547–49.

[106] AR 547.

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] AR 548.

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

Based on his examination, Dr. Bayne opined that the plaintiff could stand and walk "with appropriate breaks" for six hours in an eight-hour workday.[117] She could sit, with appropriate breaks, for six hours in an eight-hour workday.[118] He further found that

> Repetitive flexion, extension and rotation of her neck should be limited to occasionally. Working with the left hand above the shoulder level should be limited to occasionally. There are no restrictions in performing bilateral repetitive finger, hand and wrist manipulations or bilateral repetitive hand tasks frequently. She should be able to lift and carry 10 pounds frequently and 20 pounds occasionally. There are no restrictions on flexion, extension, bending, crouching, crawling and stooping. She should be able to work in any work environment except on unprotected heights.[119]

### 2.1.4    Jenny Forman, M.D. — Examining

On August 1, 2013, Jenny Forman, M.D., a psychologist, saw the plaintiff for a psychiatric evaluation.[120] The plaintiff reported experiencing depression and anxiety "due to her medical condition and change in lifestyle."[121] Her symptoms included insomnia, restlessness, nervousness, worrying, feeling overwhelmed, occasional sadness and irritability, and mildly diminished memory and concentration.[122] Her daily activities included walking, watching television, doing light household chores, going to church on Sundays, and spending time with her children.[123] Based on her assessment, Dr. Forman opined that the plaintiff had no impairments with respect to work-related activities. Specifically, she was able to do the following: follow both simple and complex instructions; maintain adequate pace or persistence to perform simple or complex tasks; withstand the stress of an eight-hour workday; interact appropriately with co-workers, supervisors, and the

---

[117] AR 549.

[118] *Id.*

[119] *Id.*

[120] AR 674–77.

[121] AR 674.

[122] *Id.*

[123] *Id.*

public on a regular basis; adapt to changes, hazards, or stressors in the workplace; manage funds; and work for eight hours each day.[124]

### 2.1.5 Robert Miller, M.D. — Treating

Robert Miller, M.D., a physical medicine and rehabilitation specialist, saw the plaintiff on October 28, 2013 for neck pain, numbness, and tingling.[125] Dr. Miller referred her for a cervical MRI and prescribed 500 mg of Lortab daily and Ambien for sleep.[126] He also recommended a cervical-traction trial.[127]

On July 1, 2014, Dr. Miller completed an impairment questionnaire.[128] He diagnosed the plaintiff with carpal-tunnel syndrome, neck pain, cervical-degenerative disease, and joint pain in her hand.[129] Her primary symptoms were neck pain, numbness, and tingling on her right side.[130] Her pain was caused by a history of cervical-disc protrusion, and it occurred on a daily basis.[131] Repetitive motion aggravated her pain.[132] Her treatments included physical therapy and medication, and surgery was recommended.[133]

Dr. Miller opined that the plaintiff could perform a job in a seated position for up to four hours in an eight-hour workday, and she could perform a job standing and/or walking for six or more hours in an eight-hour workday.[134] He further opined that it was medically necessary for the plaintiff to avoid continuous sitting in an eight-hour workday. She had to get up from a seated

---

[124] AR 676.

[125] AR 687–88.

[126] AR 688.

[127] *Id.*

[128] AR 770–75; AR 837–41 (same).

[129] AR 771.

[130] AR 772.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] AR 773.

position and move around for twenty minutes every hour before she could sit again.[135] Dr. Miller opined that the plaintiff could occasionally lift and carry up to ten pounds, and could never or rarely lift and carry more than ten pounds.[136] She could occasionally grasp, turn, and twist objects, use her hands and fingers for fine manipulations, and reach (including overhead) with both arms.[137] Dr. Miller opined that the plaintiff's symptoms would increase if she worked in competitive employment due to an increase in her neck pain.[138] Her symptoms would occasionally interfere with her attention and concentration.[139] She would likely miss work once per month due to her impairments.[140] Emotional factors did not contribute to her functional limitations.[141]

### 2.1.6    Katalin Galasi, Psy.D. (Kaiser) — Treating

On April 24, 2013, Katalin Galasi, Psy.D., a psychologist, saw the plaintiff for "anxiety including excessive worry and muscle tension[,] life problems including relationship problems[,] and health problems."[142] The plaintiff had been "more anxious over the past month" due to "various stressors."[143] For example, the plaintiff was in the process of seeking disability benefits.[144] Also, "when she ha[d] time to think about her health issues, her pain [was] much worse than when busy."[145] She denied any prior history of anxiety.[146] In addition, the plaintiff had ongoing neck and shoulder pain.[147] She was considering surgery on her neck and shoulders but

---

[135] *Id.*

[136] *Id.*

[137] AR 774.

[138] *Id.*

[139] *Id.*

[140] AR 775.

[141] *Id.*

[142] AR 1169–82.

[143] AR 1170.

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Id.*

was "hesitant" and "worrie[d]" her condition would not improve with surgery.[148] "Another stressor" was the plaintiff's relationship with her husband.[149] They argued frequently, he was in recovery from drugs, and he sometimes spoke disrespectfully to her.[150] Dr. Galasi recommended that the plaintiff reduce her caffeine intake and reminded her that certain medications may contribute to anxiety.[151] She also encouraged self-care, including healthy eating and continued exercise.[152] Dr. Galasi referred the plaintiff to a chronic-pain program as well.[153]

On November 17, 2014, Dr. Galasi had a follow-up appointment with the plaintiff over the phone.[154] The plaintiff was experiencing increased stress due to "some challenges at home."[155] Dr. Galasi saw the plaintiff on November 19, 2014 regarding her son's drug abuse.[156] The plaintiff's husband's prescription-medication addiction was also contributing to her stress.[157] She reported experiencing anxiety (including excessive worry), occasional headaches, depression, crying spells, irritability, agitation, guilt, and decreased libido.[158] She was tearful during the appointment.[159] Dr. Galasi referred the plaintiff to group therapy.[160]

---

[148] *Id.*

[149] *Id.*

[150] *Id.*

[151] AR 1172–73.

[152] AR 1173.

[153] AR 1173, 721, 723.

[154] AR 1192–93.

[155] AR 1192.

[156] AR 1194–96.

[157] AR 1195.

[158] *Id.*

[159] *Id.*

[160] AR 1196.

### 2.1.7 Ward D. Finer, Ph.D. (Kaiser) — Treating

On July 20, 2017, Ward D. Finer, Ph.D., a psychologist, saw the plaintiff for depression.[161] The plaintiff reported that she had become "more depressed over the last several months."[162] Her mother had passed away in October 2016, and her son was arrested for drug use and was in a rehabilitation program.[163] In addition, her husband continued to have problems related to employment and medication.[164] The plaintiff reported "always feel[ing] sad" and that she cried easily — several times each week.[165] She was "more irritable than usual" and "tend[ed] to nag her husband."[166] She felt "more tired than usual," had stopped going to the gym, and felt bad about recent weight gain.[167] She also reported that her husband had been physically abusive in the past but denied current physical threats or abuse.[168] Moreover, "[w]hereas she is normally energetic and upbeat" she found herself "increasingly tired, sad and prone to get into conflicts with people."[169] She reportedly had not felt that way before and had not previously undergone a trial of antidepressant medication.[170] She was open to a medication consultation as well as group therapy.[171] Dr. Finer referred the plaintiff to psychotherapy treatment with Sasikala Manavalan, M.D.[172]

---

[161] AR 2405–12.

[162] AR 2406.

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] AR 2409.

[170] *Id.*

[171] *Id.*

[172] AR 2410-11.

### 2.1.8    Sasikala Manavalan, M.D. (Kaiser) — Treating

On July 21, 2017, Sasikala Manavalan, M.D., a psychiatrist, saw the plaintiff for a psychiatric evaluation.[173] The plaintiff reported "worsening depression and anxiety over the last 8 months since the passing of her mother."[174] She admitted that she "probably never got over it, as she continue[d] to feel guilt that she did not spend more time with her."[175] She reported additional stressors, including recent weight gain, "constant fights" with her husband, and family stress with one of her daughters who abused drugs.[176] She also reported a "drastic decline from her baseline level of functioning."[177] She was no longer interested in exercising, socializing, or shopping.[178] She had "low energy[,] decreased interest, low mood and anhedonia."[179] Dr. Manavalan noted that the plaintiff appeared tearful, depressed, dysphoric, anxious, and sad but was also pleasant and cooperative.[180] Dr. Manavalan diagnosed the plaintiff with "major depressive disorder, recurrent episode, severe."[181] She prescribed Citalopram (Celexa), 10 mg to be taken daily.[182]

Dr. Manavalan saw the plaintiff again on August 4, 2017.[183] The plaintiff reported she was "[d]oing a little bit better."[184] She reported only one crying episode since her last appointment and "[o]verall fe[lt] less sad and more relaxed, able to brush off things more easily and not become as easily frustrated."[185] Her symptoms included continued depressed mood, anhedonia, and insomnia,

---

[173] AR 2424–35.

[174] AR 2424.

[175] *Id.*

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] AR 2430.

[181] AR 2431.

[182] *Id.*

[183] AR 2478–90.

[184] AR 2478.

[185] *Id.*

though her symptoms had "improved slightly."[186] Dr. Manavalan recommended a continued prescription of Celexa, 10 mg to be taken daily, as well as individual therapy.[187]

Dr. Manavalan saw the plaintiff again on September 7, 2017.[188] The plaintiff reported that her depressive-disorder symptoms had improved over the past month.[189] Dr. Manavalan noted that the plaintiff's level of depression was moderate and her global distress severity was "[m]oderately [s]evere."[190]

On October 24, 2017, Dr. Manavalan saw the plaintiff for a follow-up visit.[191] The plaintiff reported that "once again she fe[lt] she [was] back to square one in term[s] of her depression."[192] Because the anniversary of her mother's death was approaching, she had not been able to "control her sadness."[193] She was once again experiencing "crying spells."[194] Her family did not understand and "merely t[old] her to take a pill."[195] The plaintiff also continued to have troubling sleeping, was experiencing nightmares, and had been taking Ambien nearly every day.[196] She could not sleep without it.[197] She denied having any thoughts or plans to harm herself, others, or property.[198] Dr. Manavalan prescribed an increased dose of Celexa, 20 mg to be taken daily.[199] She also

---

[186] AR 2479.

[187] AR 2483.

[188] AR 2520–31.

[189] AR 2521.

[190] AR 2525.

[191] AR 2573–83.

[192] AR 2573.

[193] *Id.*

[194] *Id.*

[195] *Id.*

[196] *Id.*

[197] *Id.*

[198] AR 2577.

[199] AR 2579.

recommended reading self-help books and maintaining healthy habits, such as a proper diet, exercise, and meditation.[200] The plaintiff declined individual therapy at that time.[201]

In a letter dated November 8, 2017, Dr. Manavalan stated that the plaintiff had been diagnosed with "[m]ajor [d]epression, recurrent severe" and generalized anxiety disorder.[202] Dr. Manavalan reported that the plaintiff had been receiving treatment for depression and anxiety, "which began after the passing of her mother."[203] The plaintiff showed "minor improvement" with medication but continued to "exhibit relapses."[204] She had not been able to "function at work, having to quit her job."[205] The plaintiff "continue[d] to be motivated and [c]ooperative with treatment."[206]

On November 30, 2017, Dr. Manavalan saw the plaintiff for a follow-up visit.[207] The plaintiff reported that her depressive-disorder symptoms had "improved slightly over the past 3 months."[208] That day, however, she was having a "hard day" because her husband had been "verbally abusive" toward her.[209] Dr. Manavalan noted that Celexa helped the plaintiff with her anxiety.[210] She no longer got "overly anxious about things" and was "able to remain calm for the most part," except when her husband was "verbally abusive towards her."[211] The plaintiff was considering ending the relationship.[212] She reported feeling "excessively tired all the time" and felt "less motivated in general."[213] Dr. Manavalan recommended continued use of Celexa, 20 mg per day, and 5 mg of

---

[200] Id.

[201] Id.

[202] AR 2585.

[203] Id.

[204] Id.

[205] Id.

[206] Id.

[207] AR 2621–31.

[208] AR 2621.

[209] Id.

[210] AR 2627.

[211] Id.

[212] AR 2621.

[213] AR 2627.

Ambien per day.[214] She also prescribed Bupropion, 75 mg, one-half of a tab daily for the first ten days and then one tab daily.[215]

### 2.1.9   G. Lee, M.D. — Non-Examining

In March 2013, G. Lee, M.D., a state-agency medical consultant, opined that the plaintiff could do the following: occasionally lift and carry up to twenty pounds; frequently lift and carry up to ten pounds; stand and walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; push and pull with both upper and lower extremities.[216] She had limited ability to reach overhead on the left side and to use gross and fine manipulation in both hands.[217] She had no visual or environmental limitations.[218]

### 2.1.10   Margaret Pollack, Ph.D. — Non-Examining

In August 2013, Margaret Pollack, Ph.D., a state-agency psychology consultant, opined as follows. The plaintiff was independent in activities of daily living and had "no limitations notable from a psych perspective."[219] Dr. Pollack noted that, during a consultative examination earlier that month, the plaintiff was cooperative and demonstrated no thought disorder or mood lability.[220] She did not indicate any cognitive impairments.[221] She had no limited capacity for substantial gainful activity due to her psychological allegations.[222]

---

[214] Id.

[215] Id.

[216] AR 111.

[217] Id.

[218] AR 111–12.

[219] AR 125.

[220] Id.

[221] Id.

[222] Id.

## 2.2    Other Opinion Records

On December 26, 2012, David Carlson, the plaintiff's husband, completed a third-party function report.[223] By that point, Mr. Carlson had known the plaintiff for five years.[224] They were together every day and did "everything" together.[225] He reported that the plaintiff could not bend her neck and experienced the following conditions: lower-back pain; shoulder pain; numbness in her hand; and throbbing pain.[226] Her pain affected her sleep.[227] She would "try to stretch or walk lightly to ease [the] pain."[228]

The plaintiff could not lift her left shoulder, but otherwise her conditions did not affect her ability regarding personal care.[229] She did not need reminders to take care of her personal needs or grooming.[230] She did not cook or prepare her own meals.[231] She was unable to do any household chores because she had "pain with movement."[232] He further reported that the plaintiff went outside daily and traveled by car.[233] She could not go out alone in case she experienced "sudden pain."[234] She went grocery shopping once per week.[235]

She could pay bills but could not count change, handle a savings account, or use checkbooks or money orders due to "pain with [her] hands."[236] Mr. Carlson stated that the plaintiff's

---

[223] AR 276–84.
[224] AR 276.
[225] *Id.*
[226] *Id.*
[227] AR 277.
[228] *Id.*
[229] *Id.*
[230] AR 278.
[231] *Id.*
[232] AR 278–79.
[233] AR 279.
[234] *Id.*
[235] *Id.*
[236] *Id.*

conditions had not affected her ability to handle money.[237] The plaintiff had no hobbies and did not socialize with others.[238] She attended church on Sundays.[239]

Mr. Carlson reported that the plaintiff's pain affected her ability to do the following: lift; squat; bend; stand; reach; walk; sit; and climb stairs.[240] The plaintiff was "ok" with respect to following written and spoken instructions and getting along with authority figures.[241] She also was "good" at handling stress and changes to her routine.[242] The plaintiff took Vicodin for her pain, which made her sleepy.[243]

Mr. Carlson completed a second third-party function on November 6, 2015.[244] He reported that the plaintiff could not use her hands due to arthritis.[245] She also had neck pain that caused headaches.[246] She slept a lot.[247] She woke up randomly due to "hands stiffening up" or pain in her hands.[248] She was "very limited" in making meals but made them daily.[249] She could do "light cleaning," including washing dishes and folding laundry, for about fifteen to twenty minutes "with breaks in between."[250] She went outside daily, could drive a car, and could travel alone.[251] She shopped for groceries.[252] She could pay bills, count change, and use a checkbook and money

---

[237] AR 280.

[238] Id.

[239] Id.

[240] AR 281.

[241] AR 281–82.

[242] AR 282.

[243] AR 283.

[244] AR 1136–43.

[245] AR 1136.

[246] Id.

[247] AR 1137.

[248] Id.

[249] AR 1138.

[250] Id.

[251] AR 1139.

[252] Id.

orders.[253] Mr. Carlson handled the savings account.[254] She watched television, used the internet, and read daily.[255] She spent time with family members on the weekends and went to Starbucks and church on a regular basis.[256] She became "moody and irritable" due to her pain.[257] The plaintiff's conditions affected her ability to lift, squat, bend, stand, kneel, hear, climb stairs, concentrate, use her hands, and get along with others.[258]

### 2.3    The Plaintiff's Testimony

The plaintiff previously worked as a quality-control inspector of electronics from February 2005 to February 2008, January 2009 and March 2009, and January 2010 to May 2012.[259] She also worked as a cashier in a restaurant in 2006 and 2007, and in retail in 1989 and 1990.[260] More recently, she worked part-time at a school as a lunch monitor for about an hour each day.[261]

As a quality-control inspector, she inspected circuit boards through a microscope and lifted and carried boxes of circuit boards to a shipping area.[262] In that job, she "look[ed] under [a] microscope . . . to look at products," sat, and lifted products.[263] She frequently lifted up to twenty-five pounds.[264] She reported "sit[ting] all day look[ing] under [her] scope to look at products."[265] She bent her neck "all day" and used her hands.[266]

---

[253] *Id.*

[254] *Id.*

[255] AR 1140.

[256] *Id.*

[257] AR 1141.

[258] *Id.*

[259] AR 294.

[260] *Id.*

[261] *Id.*

[262] AR 874–75.

[263] AR 295.

[264] *Id.*

[265] AR 296; *see also* AR 874–75 (hearing testimony).

[266] AR 297.

In a December 26, 2012 function report, the plaintiff reported that she could not bend her neck and she had the following additional impairments: lower-back pain; shoulder pain; numbness in both hands; an inability to move her left shoulder; throbbing pain; stiffness; an inability to move without pain; and shooting pain in her neck.[267] She tried to "stretch or walk lightly to ease [her] pain."[268] Her pain affected her sleep.[269] She also could not lift her left hand when she got dressed.[270]

She could not cook because her hands would go numb and she could not move her hand or shoulder.[271] She was unable to do any household chores.[272] She went outside daily and traveled by car. She would not travel alone in case she experienced "sudden pain."[273] She went grocery shopping once per week.[274] She could not pay bills, count change, handle a savings account, or use checkbooks or money orders because her hand would go "numb when writing."[275] She had no hobbies and did not socialize, but she attended church every Sunday.[276] She needed someone to accompany her.[277]

Her pain affected her ability to do lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, complete tasks, concentrate, and use her hands.[278] She was able to finish what she started — for example, movies or a conversation.[279] She was "good" at following written instructions,

---

[267] AR 285.

[268] AR 286.

[269] Id.

[270] Id.

[271] AR 287.

[272] Id.

[273] AR 288.

[274] Id.

[275] Id.

[276] AR 289.

[277] Id.

[278] AR 290.

[279] Id.

getting along with authority figures, and handling stress and changes to her routine.[280] She could follow spoken instructions if she "listen[ed] very well."[281] She took Vicodin for her pain, which made her sleepy.[282]

She completed another function report on November 6, 2015.[283] She reported experiencing chronic-neck pain, shoulder pain, and stiffness and tingling in both hands.[284] She felt pain shooting down her left leg, got headaches due to neck pain, and experienced drowsiness due to medication.[285] She woke up from neck pain and tingling in her hands.[286] She prepared meals, often sandwiches, daily.[287] She sometimes could not prepare meals due to stiffness in her hands.[288] She could do limited household chores. She could travel outside alone and go shopping for groceries with family members.[289] She could count change, but her husband paid the bills, handled a savings account, and used a checkbook and money orders.[290] She watched television and went to church regularly.[291] She did not spend time with others.[292] Her conditions continued to affect her ability to lift, squat, bend, stand, reach, walk, sit, climb stairs, and use her hands.[293]

---

[280] AR 290–91.

[281] AR 290.

[282] AR 292.

[283] AR 1144–52.

[284] AR 1144.

[285] *Id.*

[286] AR 1145.

[287] AR 1146.

[288] *Id.*

[289] AR 1147.

[290] *Id.*

[291] AR 1148.

[292] *Id.* Mr. Carlson's third-party function dated November 6, 2015 contradicts the plaintiff's self-report from the same day in several ways. For example, Mr. Carlson stated that the plaintiff socialized with family members on the weekends, but the plaintiff reported that she did not spend time with others. *Compare* AR 1140 *with* AR 1148. Mr. Carlson reported that the plaintiff could do light chores, such as washing dishes and folding laundry, but the plaintiff said her ability to do chores was "limited." *Compare* AR 1138 *with* AR 1146.

[293] AR 1149.

The plaintiff testified that she began experiencing depression and anxiety "way before [] July 2017."[294] She did not immediately seek mental-health treatment because she thought she could "fix it on [her] own."[295] Her symptoms worsened in October 2016 when her mother passed away.[296] She took medication, but it had "its ups and downs."[297] She, for instance, was "just not the person that [she was]."[298] She also had a panic attack at a school, where she worked part-time, when a shooting occurred there.[299] She "didn't know how to handle it" because she was on medication.[300] She had panic attacks at least once per month.[301]

She experienced other symptoms as a result of her medication. She "sometimes" could not concentrate on movies or books.[302] She would "keep to [her]self" rather than socializing with others.[303] At the hearing before the ALJ, she did not want to elaborate further because she "really [did]n't want to talk about it."[304]

She testified that she could not return to her past work as a circuit-board inspector because "it would bother . . . [her] with [her] condition."[305] "[W]orst of all is the medication" that she took.[306] "[She] would just have a panic attack there, or some kind of panic attack by the time [she] walked out" of work.[307] She also stated that her physical limitations "worsened . . . everything [was]

---

[294] AR 890.

[295] *Id.*

[296] AR 891.

[297] *Id.*

[298] *Id.*

[299] AR 892.

[300] *Id.*

[301] *Id.*

[302] AR 892–93.

[303] AR 893.

[304] *Id.*

[305] AR 894.

[306] *Id.*

[307] *Id.*

United States District Court
Northern District of California

flaring up."[308] Her hands flared up daily.[309] Her shoulder "still bother[ed her]."[310] After "sitting for

a long period of time, [she could] just feel it . . . getting tight. It's kind of tight and aching."[311] She

took medication for her symptoms, but with her medications she would get "violent."[312] With

respect to her neck, her doctors wanted "to do a lot of surgery on [her]," but she did not "want to

go that way."[313] She was "scared" to have surgery.[314]

She could not do household chores due to "flare-ups."[315] She also could not go grocery

shopping.[316] "Once in a while, but not all the time" should would clean the house and do dishes.[317]

When she had a flare-up, it would take "at least . . . three hours or so" for it to go "down."[318]

She further testified that she was recently diagnosed with diabetes. She would "get dizzy" and

sweat and was given a kit to monitor her blood sugar.[319] She also received cortisone shots in her

hands every six months, but they reportedly did not work.[320]

### 2.4    Vocational Expert Testimony

#### 2.4.1    VE Susan Creighton Clevelle's testimony

VE Susan Creighton Clevelle testified at the October 26, 2017 hearing.[321] The ALJ posed the

following hypothetical: an individual with no limitation on sitting, standing, or walking; carrying

and lifting no more than ten pounds with the non-dominant left-upper extremity; no overhead

---

[308] AR 894–95.

[309] AR 895.

[310] *Id.*

[311] *Id.*

[312] *Id.*

[313] AR 895–96.

[314] AR 896.

[315] *Id.*

[316] *Id.*

[317] *Id.*

[318] AR 897.

[319] AR 898.

[320] AR 899.

[321] AR 901, 908–17.

reaching and only occasional reaching, handling, fingering, and feeling; reaching, handling, fingering, and feeling frequently with the dominant right-upper extremity, but only occasional overhead reaching.[322] In addition, the hypothetical individual could perform repetitive neck motions in all directions for only fifteen minutes at a time, and she could hold her neck in a static position only occasionally, cumulatively no more than one-third of the workday.[323] The ALJ asked whether such an individual could perform the jobs of an office helper (DOT 239.567-010), parking-lot attendant (915.473-010), and storage-facility rental clerk (295.367-026).[324]

VE Clevelle testified that the office-helper job would be excluded because the "clerical-type activities" performed at the job would require use of both hands.[325] The hypothetical individual could perform the parking-lot attendant job because that could be done with the dominant right hand only.[326] Similarly, the individual could work as a storage-facility clerk because "that job could be done one-handed as well."[327] VE Clevelle testified that such an individual could perform other light jobs as well, including as an information clerk (DOT 237.367-018), usher (344.677-014), and photo-counter clerk (249.366-010).[328]

The individual's RFC, including her overhead-reaching limitation, would not preclude the above jobs.[329] In addition, the individual could perform these jobs even with limited neck movement.[330] "They're not keeping their head static . . . holding it in one place. None of these jobs they're doing that. They have the flexibility to move their head when they need to."[331]

---

[322] AR 908–09.

[323] AR 909.

[324] Id.

[325] AR 910.

[326] Id.

[327] Id.

[328] AR 912.

[329] AR 911.

[330] AR 914–15.

[331] AR 914–15.

### 2.4.2    VE Lawrence Hughes's testimony

VE Lawrence Hughes testified at the February 13, 2018 hearing.[332] VE Hughes classified the plaintiff's prior work as a circuit-board inspector (DOT 726.684-062), SVP three and medium.[333]

The ALJ posed the following hypothetical: an individual capable of lifting and carrying ten pounds frequently and up to fifteen pounds occasionally; standing and walking no more than four hours per day; sitting up to six hours per day; no ladders, ropes, or scaffolds, and all other posturals occasional only; frequent reaching, handling, fingering in both upper extremities, except only occasional overhead reaching on the left side; and no exposure to dangerous moving machinery or unprotected heights.[334]

VE Hughes testified that the above hypothetical individual could perform the job of a circuit-board inspector.[335] That job is "a seated job that lifts very light weight throughout the day."[336] Moreover, neck-movement limitations — specifically, performing repetitive neck motions for no more than fifteen minutes at a time and holding her head in a static position occasionally only — would not preclude an individual from this job.[337] "The repetitive neck motion is a non-issue, because there's not a lot of neck motion. But, the static position is held most of the time when you're looking through the microscope . . . . [Y]ou do have to hold a static position for probably a minute at a time before you look up from where you are."[338]

The plaintiff's attorney suggested that the plaintiff would be limited to unskilled work due to "the severity of her mental impairments."[339] VE Hughes testified that an individual limited to

---

[332] AR 861, 877–89.

[333] AR 877.

[334] AR 881.

[335] AR 881–82.

[336] AR 882.

[337] *Id.*

[338] AR 882–83.

[339] AR 883.

unskilled work could not perform the circuit-board inspector job because it required semi-skilled work.[340]

VE Hughes further testified that the above hypothetical individual could perform other light unskilled jobs, such as a cashier (DOT 211.462-010), electronical-accessories assembler (DOT 729.687-010), and small-products assembler (DOT 739.687-030).[341]

## 2.5    Medical Expert Testimony

ME Kendrick testified at the February 13, 2018 hearing.[342] ME Kendrick opined that, based on the medical record, the plaintiff had "evidence of spinal stenosis, classified as severe at the C2-3, and C4-5 levels."[343] She had a "narrowing of the spinal canal."[344] She had "carpal tunnel release on the left, with a fusion of the PIP joint of her finger on that side.[345] Her finger became infected, but the wire was removed and she went on to heal.[346] The plaintiff also developed carpal-tunnel syndrome on her right side.[347] She had osteoarthritis of the right second toe.[348] Her "left shoulder problem manifested by calcific tendonitis."[349] Furthermore, she had crystal deposits in her joints.[350]

ME Kendrick testified that the plaintiff's impairments did not meet, or in combination equal, the severity of the medical listings.[351] He assessed her RFC as "someplace between light and

---

[340] *Id.*

[341] AR 884–85.

[342] AR 861, 864–70.

[343] AR 864.

[344] *Id.*

[345] AR 864–65.

[346] AR 865.

[347] *Id.*

[348] *Id.*

[349] *Id.*

[350] *Id.*

[351] *Id.*

sedentary."[352] Specifically, she had the following limitations: lifting fifteen pounds occasionally and ten pounds less frequently; standing or walking for four hours in an eight-hour workday; sitting for six hours in an eight-hour workday; only occasional bending, stooping, kneeling, and crawling; climbing stairs occasionally but no climbing ladders, ropes, or scaffolds; using all modalities frequently, except only occasional overhead reaching on the left; and no exposure to dangerous moving machinery or unprotected heights.[353]

With respect to the plaintiff's neck-movement limitations, ME Kendrick testified that "the head and neck moves depends on how she feels. . . . [On] days where it feels fine . . . she might have slight restriction on motion, but certainly her motion is functional."[354] He "would not impose any specific restrictions because the body does it for her."[355] Moreover, the crystal deposits could "affect any joint . . . . You get an acute episode of pain, and swelling, and it will subside. And, basically the inflammation will go into a quiet period."[356] That disease, however, "does not destroy joints."[357] "[I]t doesn't compare to rheumatoid arthritis."[358]

ME Kendrick also considered the plaintiff's edema in her hand.[359] She had some "tenderness in the palpation dip and metacarpal flengial and PIP joints."[360] The plaintiff's attorney asked whether such symptoms could cause "flare-ups of that nature if the plaintiff were to engage in frequent manipulation on a day-to-day basis in the workplace."[361] ME Kendrick testified that "she might have . . . a little swelling, and then it goes away."[362]

---

[352] AR 866.

[353] Id.

[354] AR 867.

[355] Id.

[356] Id.

[357] AR 868.

[358] Id.

[359] AR 868–69.

[360] AR 869.

[361] Id.

[362] Id.

### 2.6 Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether the plaintiff was disabled and concluded that she was not.[363]

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since May 31, 2012, the alleged onset date.[364]

At step two, the ALJ found that the plaintiff had the following severe impairments: cervical stenosis; a history of bilateral carpal-tunnel syndrome, status post history of left release and planned right release; left calcific tendonitis; and right second-toe osteoarthritis.[365] The ALJ found that the plaintiff's pre-diabetes diagnosis and hyperglycemia were nonsevere.[366] The ALJ also considered the plaintiff's depression and anxiety, finding that those mental impairments, "considered singly and in combination, d[id] not cause more than minimal limitation in the ability to perform basic mental work activities and [were] nonsevere."[367] He based that conclusion on the following evidence.

In April 2013, a psychological evaluation noted that some of the plaintiff's anxiety could be related to her weight-loss medication and her relationship with her husband.[368] "She was assessed with transient symptoms only."[369] In August 2013, Dr. Foreman saw the plaintiff for "depression and anxiety apparently associated with her medical condition," and the examination "yielded largely unremarkable results."[370] Dr. Forman determined that the plaintiff "reflect[ed] the presence of only transient symptoms."[371]

---

[363] AR 850–59.

[364] AR 851.

[365] *Id.*

[366] AR 852.

[367] *Id.*

[368] *Id.*

[369] *Id.*

[370] *Id.*

[371] *Id.*

On July 20, 2017, the plaintiff sought mental-health treatment for the first time because of "anxiety due to a series of family issues."[372] Dr. Finer diagnosed the plaintiff with a major depressive disorder and recommended therapy.[373] On August 4, 2017, the plaintiff reported more control, "feeling less sad, being more relaxed" and "not as easily frustrated."[374] During a follow-up examination on November 30, 2017, Dr. Manavalan found that the plaintiff had a generalized anxiety disorder and a major depressive disorder, with mild symptoms.[375] The plaintiff reported that her symptoms had improved over the prior three months.[376]

In a letter dated November 8, 2017, Dr. Manavalan indicated that the plaintiff had made "minor improvement" but "ha[d] not been able to function at work, having to quit her job."[377] But, the ALJ noted,

> [t]his conclusion is contradicted by Dr. Manavalan's treatment notes and appears to be more a description of the claimant's assertions than an objective opinion about the claimant's functional ability. At that time, there is no indication that the claimant was working at a job on anything approaching a full-time basis or that she stopped working because of symptoms.[378]

Therefore, the ALJ assigned Dr. Manavalan's opinion little weight because it was "inconsistent with the treatment notes and the longitudinal record indicating no significant mental health problems interfering with work activity."[379]

The ALJ accorded Dr. Forman's opinion greater evidentiary weight because it was "based on a thorough evaluation" and was consistent with the transient psychological symptoms reported by the claimant" in 2013 and 2017.[380] The ALJ explained that the plaintiff's symptoms appeared to

---

[372] *Id.*

[373] *Id.*

[374] *Id.*

[375] *Id.*

[376] *Id.*

[377] *Id.*

[378] AR 852–53.

[379] AR 853.

[380] *Id.*

be related directly to "challenging family issues and not to an underlying mental illness."[381] He found that the plaintiff had not met her burden to establish a severe mental impairment that persisted for twelve consecutive months.[382]

In so finding, the ALJ considered the "paragraph B" criteria and found that the plaintiff had not met her burden to prove "more than mild limitations in the ability to understand, remember, or apply information; the ability to interact with others; the ability to concentrate, persist, or maintain pace; and the ability to adapt or manage oneself."[383]

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.[384] With respect to the plaintiff's cervical degenerative-disc disease, the ALJ found no evidence of compromise of a nerve root or the spinal cord or any other evidence indicating that she could not ambulate effectively.[385] Moreover, the plaintiff's carpal-tunnel syndrome did not meet or medically equal any musculoskeletal or neurological listing.[386] The ALJ also found that there was no evidence of major joint dysfunctions that would result in the inability to perform fine and gross movements effectively.[387]

Before considering the fourth step, the ALJ determined that the plaintiff had the residual functional capacity to perform light work, with the following limitations: lifting and carrying ten pounds frequently and twenty pounds occasionally; pushing and pulling with the same weight limits, except lifting fifteen pounds frequently and ten pounds occasionally; sitting, standing, or walking for six hours in an eight-hour workday; standing and walking for four hours with normal breaks; occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling;

---

[381] Id.

[382] Id.

[383] Id.

[384] AR 853–54.

[385] AR 853–54.

[386] AR 854.

[387] Id.

frequently reaching, handling, fingering, and feeling bilaterally, except occasionally reaching overhead with the left-upper extremity; and no climbing ladders, ropes, or scaffolds, or working at unprotected heights or around dangerous moving machinery.[388]

In making this determination, the ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms.[389] Her statements about the intensity, persistence, and limiting effects of these symptoms, however, were not entirely consistent with the record as a whole.[390] The ALJ found that the plaintiff had degenerative-disc disease of the cervical spine with intermittent radiculopathy.[391] She received, however, "mostly conservative treatment" for this condition and for pain management.[392] From 2011 through 2012, chiropractic manipulative therapy improved her condition.[393] She was referred for physical therapy, surgical intervention, acupuncture, and to a chronic-pain program.[394] But she did not pursue those options thoroughly and relied on medication instead.[395]

The ALJ also noted that the plaintiff sought treatment for numbness and tingling of both hands.[396] The plaintiff underwent release and surgery for her left carpal tunnel.[397] She agreed to have release and surgery for her right carpal tunnel but purportedly did not follow up on those procedures.[398] During examination, she had full range of motion of the neck, without pain and with no radicular signs.[399]

---

[388] *Id.*

[389] AR 855.

[390] *Id.*

[391] *Id.*

[392] *Id.*

[393] *Id.*

[394] *Id.*

[395] *Id.*

[396] *Id.*

[397] *Id.*

[398] *Id.*

[399] *Id.*

The ALJ considered the plaintiff's left-shoulder pain and stiffness.[400] While she had some reduced range of motion, amongst other symptoms, the plaintiff's providers recommended conservative treatments, such as shoulder stretches and massages, and she did not exhibit any neurological deficits or need for a surgical referral.[401] The ALJ also noted that the plaintiff previously injured her left foot and fractured a toe, but she recovered quickly, with mild residual pain.[402]

Moreover, the ALJ stated that his RFC assessment reflected the degree of limitation he found in the "paragraph B" mental function analysis.[403]

The ALJ asserted that his RFC assessment was supported by sufficient objective and clinical evidence, including medical-opinion evidence.[404] Specifically, the ALJ assigned greatest weight to ME Kendrick, finding his opinion was consistent with the record, including the examinations, the plaintiff's statements, and the treatment records.[405] ME Kendrick found that the plaintiff had an RFC consistent with the ALJ's determination.[406] The ALJ accorded significant weight to the state-agency medical consultants, whose opinions were consistent with ME Kendrick's determination that the plaintiff was capable of performing light work.[407]

The ALJ accorded significant weight to Dr. Forman.[408] Based on Dr. Forman's evaluation, the plaintiff's activities of daily living appeared to be unaffected by any psychological symptoms, apart from occasional insomnia. Dr. Forman declined to diagnose the plaintiff with a mental

---

[400] AR 856.

[401] *Id.*

[402] *Id.*

[403] AR 853.

[404] AR 857–58.

[405] AR 856.

[406] *Id.*

[407] AR 856–57.

[408] AR 857.

United States District Court
Northern District of California

impairment as her symptoms were "likely transient" and "expected reactions to psychosocial stressors."[409]

The ALJ gave only minimal weight to Dr. Miller's medical-source statement.[410] The ALJ explained,

> [Dr. Miller] opined significant limitations that are not supported by the objective evidence. For example, he opined limitations in sitting, and he failed to explain fully why the claimant has significant limitations in both upper extremities, not only for reaching, but for handling and fingering as well. . . . Dr. Miller's opinion is in conflict with all other opinions of record, and, although he is a 'treating source,' he saw the claimant only every three to six months.[411]

Further, the ALJ found unpersuasive Mr. Carlson's third-party function report.[412] In that report, Mr. Carlson indicated that the plaintiff could not perform certain activities of daily living. The record indicated, however, that although she had some limitations in her left-upper extremity and with neck movement, she had "little difficulty with standing, walking, and sitting at a light exertional level."[413]

Finally, the ALJ found the plaintiff's testimony regarding the severity and functional consequences of her symptoms inconsistent with the record as a whole.[414] The ALJ noted that the plaintiff failed to follow through with various recommended treatments.[415] For example, she appeared to improve with chiropractic treatment, but she only attended one acupuncture session and did not follow through with a chronic-pain program.[416]

---

[409] *Id.*

[410] *Id.*

[411] *Id.*

[412] *Id.*

[413] *Id.*

[414] *Id.*

[415] *Id.*

[416] *Id.*

At step four, the ALJ concluded that the plaintiff was capable of performing her past relevant work as a circuit-board inspector.[417] That work did not require performance of work-related activities precluded by the RFC.[418] Accordingly, the ALJ concluded that the plaintiff was not disabled and denied her applications for SSDI benefits and SSI.[419]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

---

[417] AR 858.

[418] *Id.*

[419] AR 858–59.

United States District Court
Northern District of California

be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).
>
> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).
>
> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).
>
> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

The plaintiff contends that the ALJ erred by failing to consider her mild mental limitations in assessing her RFC.[420] The court agrees.

In order to properly determine a claimant's RFC, the ALJ must consider the claimant's mental limitations in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *See* 20 C.F.R. § 404.1520a(c)(3); *Smith v. Colvin*, No. 14-cv-05082-HSG, 2015 WL 9023486, at *8 (N.D. Cal. Dec. 16, 2015). The Code of Federal Regulations requires an ALJ to consider all of the claimant's limitations when assessing her RFC, including any nonsevere mental limitations. 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity."). Furthermore, SSR 96–8p provides:

> In assessing RFC, the adjudicator must consider only limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may — when considered with limitations or restrictions due to other impairments — be critical to the outcome of a claim.

Here, in determining the severity of the plaintiff's impairments, the ALJ found that the plaintiff had "mild limitations" with respect to the four functional areas outlined in § 404.1520a(c)(3).[421] He therefore determined that the plaintiff's mental impairments existed but were "nonsevere."[422] The ALJ stated that his step two determination was "not a residual functional capacity assessment."[423] That assessment, he recognized, "requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult

---

[420] Motion for Summary Judgment – ECF No. 17 at 5–11.

[421] AR 853.

[422] *Id.*

[423] *Id.*

mental disorders listings."[424] He explained that his RFC assessment "reflects the degree of limitation I found in the 'paragraph B' mental function analysis."[425] The ALJ, however, did not adequately account for the plaintiff's mental limitations in determining her RFC.

The defendant argues to the contrary, pointing to the ALJ's weighing of Dr. Forman's opinion that the plaintiff had no mental impairment.[426] In according Dr. Forman's opinion significant weight, the ALJ explained:

> She conducted a thorough clinical interview and evaluation. In particular, the claimant's activities of daily living appear unaffected by any psychological symptoms, and, apart from reports of occasional insomnia, the mental status examination was unremarkable. Dr. Forman declined to diagnose the claimant with a mental impairment, and she opined that, with a GAF score of 75, the claimant's symptoms were likely transient and were expected reactions to psychological stressors. The clinical record shows that the claimant briefly and intermittently experienced mild anxiety secondary to family stressors [].[427]

But the ALJ in no way attempted to reconcile Dr. Forman's finding of no mental impairment with his own finding of "mild" mental impairments.[428]

The same error occurred in *Hutton v. Astrue*, 491 F. App'x 850 (9th Cir. 2012).[429] There, the ALJ found that a mild limitation in concentration, persistence, and pace due to the claimant's PTSD was nonsevere. *Id.* at 850. In determining the RFC, the ALJ "excluded Hutton's PTSD from consideration" because the ALJ found that Hutton was not credible. *Id.* The Ninth Circuit held,

---

[424] *Id.*

[425] *Id.*

[426] Cross-Mot. – ECF No. 18 at 4.

[427] AR 857.

[428] *See* AR 853, 857.

[429] A number of district courts in this circuit follow *Hutton. See, e.g., Barrera v. Berryhill*, No. CV 17-07096-JEM, 2018 WL 4216693, at *5 (C.D. Cal. Sept. 5, 2018) (finding reversible error where ALJ did not consider nonsevere impairments in RFC assessment and offered only "boilerplate language" that she considered "all symptoms"); *Gates v. Berryhill*, No. ED CV 16-00049 AFM, 2017 WL 2174401, at *3 (C.D. Cal. May 16, 2017) (rejecting Commissioner's argument that one could "infer" that the ALJ considered plaintiff's mild mental limitations as inconsistent with *Hutton*); *Reddick v. Colvin*, No.: 16cv00029 BTM (BLM), 2016 WL 3854580, at *4 (S.D. Cal. July 15, 2016) (remanding because ALJ did not include plaintiff's mild mental restrictions in RFC assessment); *Smith*, 2015 WL 9023486, at *8–*9 (same); *Kramer v. Astrue*, No.CV 12-5297-MLG, 2013 WL 256790 at *2–*3 (C.D. Cal. Jan. 22, 3013) (same).

United States District Court
Northern District of California

"while the ALJ was free to reject Hutton's testimony as not credible, there was no reason for the ALJ to disregard his own finding that Hutton's nonsevere PTSD caused some 'mild' limitations in the areas of concentration, persistence or pace." *Id.* at 851.

As in *Hutton*, the ALJ did not discuss or give reasoned consideration of the plaintiff's depression and anxiety in his RFC assessment. The ALJ did not explain that he had considered the mild mental limitations or nonsevere impairments and offered only boilerplate language that the plaintiff's RFC "reflects the degree of limitation I found in 'paragraph B' mental function analysis."[430] *See Smith*, 2015 WL 9023486, at *8–*9 (finding nearly the exact same statement insufficient for purposes of the RFC analysis). While the ALJ was not required to include properly rejected medical-opinion evidence of other providers, he could not disregard his own finding that the plaintiff had mild mental limitations.[431] *See* 20 C.F.R. § 404.1545(a)(2); *Hutton*, 491 F. App'x at 850 (holding that while the ALJ was free to reject the claimant's testimony as not credible, he could not disregard his own finding that the claimant had some mild mental limitations); *Curtis v. Comm'r of Soc. Sec.*, 584 F. App'x 390, 391 (9th Cir. 2014) ("Although the ALJ wrote that he considered '[a]ll impairments, severe and non-severe,' in determining [the claimant's] residual functional capacity (RFC), we are unable to determine on the record before us whether the ALJ adequately considered [the claimant's] mental health limitations."). Moreover, the ALJ's VE hypotheticals did not take into account the plaintiff's mental limitations, although VE Hughes testified that an individual limited to unskilled work due to the severity of her mental impairments could not work as a circuit-board inspector.[432]

These errors were not "'inconsequential to the ultimate nondisability determination,'" and were not harmless. *See Molina*, 674 F.3d at 1115 (internal citation omitted). On this record, the court cannot determine what would have happened had the ALJ considered the plaintiff's mild

---

[430] AR 853.

[431] *See* AR 853.

[432] At the February 13, 2018 hearing, the plaintiff's attorney suggested that the plaintiff would be limited to unskilled work due to "the severity of her mental impairments." AR 883. VE Hughes testified that an individual limited to unskilled work could not perform the circuit-board inspector job because it required semi-skilled work. *Id.*

mental impairments when assessing the RFC or how the vocational experts would have testified had that limitation been included in the hypotheticals posed. *See Gates*, 2017 WL 2174401, at *3. The court thus finds it necessary to remand for further proceedings to fully and correctly assess the plaintiff's RFC.

## CONCLUSION

The court grants the plaintiff's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands the case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: March 10, 2019

_____

LAUREL BEELER
United States Magistrate Judge